COALTER, J.
The first question is, Whether the paper has been proved to be in the handwriting of the deceased by two competent witnesses? It is admitted, that there is one full and complete witness on this point; but it is said the other witnesses are incompetent, and if so that one witness is not enough. Waiving this last question, and saying nothing of the other witnesses, or of their competency, especially in a court of probat, I think, that according to (he *322 opinions of all the judges in the case of Redford v. Peggy, Ewing and Brown are both competent witnesses to the handwriting. It is not pretended, that it is in the handwriting of any one else; nor was any one acquainted with his hand, examined on the other side, to throw any doubt on this subject. It is like his hand, all the witnesses say. It was found preserved in a pocket book in his tjureau, the day after his interment; and if placed there by himself, as we have every reason to believe, he would hardly preserve it as an ingenious specimen of the forgery of his own hand. The controversy seems not to have turned on this point; and hence the witnesses seem not to have been particularly examined as to their belief. The controversy seems to have turned mainly on the question, Whether this is a testamentary paper, or merely a memorandum to make a will by? On that point the witnesses were examined and cross examined, with great minuteness and care; not so as to the handwriting. Brown who administered on the estate of the deceased, and possessed himself of his books and papers, and thus became well acquainted with his hand, had no hesitation in believing the paper in question to be in his hand. Ewing had twice seen him write notes of hand. He was also one of those, who, after the funeral, searched his papers for a will. This examination of his papers gave him a further opportunity of seeing and becoming acquainted with the character of his hand. He believed the paper was in the testator’s handwriting. On the whole, I feel no hesitation in saying (especially as the court below which heard the testimony of the witnesses, which may have been more full than the minute taken of it by the clerk, was satisfied as to that matter) that the paper in question is in the handwriting of the deceased.
The next and principal question is, Whether this is a testamentary paper? A question, which, it seems to me, ought to be considered and decided, if that can be done, on the face of the paper itself. The object of the law in requiring wills to be in writing, and, where not wholly written by the testator, to be published by him in the presence of witnesses, .subscribing their names in his presence, and providing that a will so published and preserved, shall not be abrogated by parol proofs, is to prevent those perjuries, by which wills might either be set up, or revoked, contrary to the intention of the deceased.
*This paper is, certainly, very informal : but no one would say, that if this identical paper had been published in the presence of two witnesses according to the provisions of the statute, it would not be a good will. But our law has supposed, that a paper wholly written by a deceased person, subscribed by him, and bearing on its face evidence of a disposition of property in contemplation of death, especially where such disposition of property is made in such form as to shew, that he has completed all the dispositions intended to be made, and this is evidenced by making executors and signing the paper, has every guard thrown around it, which would be necessary to make it a will, if published in the presence of witnesses: that writing and signing such a paper (unless a suspended intention appear on its face, or that it is incomplete, by breaking off in its provision, want of signature &c. so as to shew, that it is only a disposition in part, and that something further was intended, whereby it would appear that the paper, in that form, was not intended as a will) is as much a publication of a will, as a publication in the presence of witnesses.
[Here the judge read the paper, and marked and described, with minute accuracy, all the peculiar circumstances appearing upon its face, as above detailed; and thence inferred, that it appeared on the face of the paper itself, that the testator had recurred to it frequently after it had been originally written, and made sundry alterations, amendments and additions, according to changes of circumstances or of inclination, and put his hand to it for the last time on the 12th Eebruary 1825. He also adverted to the length of time during which he had carefully preserved it, and the place and manner in which he had kept it.]
And then he proceeded: Let us suppose the case stopped here. Would or would not such a» paper, containing a full disposition of his whole estate, thus repeatedly revised and changed, at different times, according to the alteration of his circumstances (for it appears he 'had sold his slave, George after the first writing, and had also married) closing with a *provisiota for his wife, making his executors &c. be considered as a disposition of his whole estate to take effect after his death? And being written by himself, and carefully put away, must we not have considered it as a will? Unless, indeed, a will, when written by a testator, must be in more ample form than this, and bear on its face stronger evidence of a final testamentary intent.
It has been likened to the paper made mention of in the case of Matthews v. Warner, 4 Ves. 186. But that paper professed, on its face, to be “a plan of a will proposed to be drawn out,” and which, although it contained a disposition of his estate, that would have made it a wilt but for this internal evidence that it was a mere plan proposed to be drawn out, was not considered a will. That paper also contained these expressions, which were relied on to shew that the paper itself was not intended for a will: ‘’Must pray my burial may be plain” — “I must not forget my good friends Miss Mary and Miss Charlotte Howell, who desire will accept 5 guineas &c.” and, finally, it was indorsed) “a plan for the last will and testament of William Matthews &c.” It was moreover written on a piece of official paper (he was a storekeeper of the king’s dock-yard at Deptford) intersected with lines, containing (printed at the top) the different articles of which he had care; and was found loose in his desk in his office in the dock-yard with some official papers. In that case also, there was another paper, written four years afterwards, which began, “Binding myself in a very precarious state of health, the following is the plan I propose to draw *323 will from, abrogating all the others I have already drawn outGoing on to make several bequests, but breaking off in the middle of one. This was written on the back of a letter, but was found in his bureau, in the parlour of his dwelling house, in a bundle of letters and papers. Many witnesses were examined as to the declarations of the deceased ; one set speaking of positive declarations, that he had made a will, and others as positively to declarations that he had not, and would not. The lord ^chancellor said: ‘Tt is always so, whether the evidence is to rebut a resulting trust, or to explain a will, bne never fails to see, that the witnesses come with the parts'. ” This part of the evidence, he says, he lays out of the case, as in perfect contradiction. He went upon the face of the paper; the place where it was found ; the other paper &c. but, above all, on the evidence of the paper itself. He said, “It is not, it cannot be denied (the argument presses so strong) that upon the perusal of this paper the natural conclusion is, that it was his intention to make a more formal paper than this. The inference cannot possibly be avoided. Then, ex hypothesi, this paper, at the time he subscribed it, was not the law, the testament. When then, at -what period, did the voluntas tes-tandi exist quoad this instrument? If it is admitted as it must be, that when he subscribed his name, he was looking to some future act, the decision that this is his will would destroy the most general maxim I know of, voluntas testatoris ambulatoria est usque ad mortem. No man can answer the question at what time that intention existed in his mind. I know there was a period when a contrary intention existed. He has given that evidence under his own hand by the paper of 1789.” That paper, though at first admitted to probat as a will, was finally decided against by the court of commissioners. 5 Ves. 23.
But, in our case, there is nothing in the writing itself, that is, there are no expressions tending to shew, that this paper was a mere plan or memorandum to draw a will by. We must infer this fact, if we so decide, from the shape and size of the paper, and the form in which it is written. Trying this case upon the paper itself, and supposing the deceased to be unlearned as to the form of wills, but to know, that if written by his own hand, and in a way to be understood, it would be a will, though not attested by witnesses, can we say, that a paper, containing on its face evidence of repeated revision, amendments and additions, and carefully put away in his pocket books, is not to be considered testamentary?
*Catherine Lloyd’s will, mentioned in a note, 4 Ves. 200, was, in fact, a letter written by an old lady to James Browning esq. in which, among other things, she says, “But in case of my demise I desire you will draw up and leave some blanks for some small legacies, that after my funeral charges are defrayed &c. then except some legacies, I give and bequeath to J. B. my lands and tenements &c. If my assets will afford it to pay in the burrow of Southwark —~— ¿; and to Miss J. P. ^30.” &c. [going on with several bequests] : but please not put this rigmaroll in, til I send it correct. This only by way of memorandum in case I should go off suddenly.” She lived three or four months after this. The prerogative court pronounced against this paper as being conditional, in case she died suddenly, whereas she had time to make a formal will: and parol evidence was admitted. But the court of delegates reversed the sentence, and pronounced the paper as the last will.
So in the next case, James Savage’s will, in the same note; the objection to which was that it was written by the testator, disposing both of real and personal estate, and concluded with a clause of attestation, but there were no subscribing witnesses. It was considered imperfect by Dr. Calvert, on account of the clause of attestation not being witnessed ; and he admitted parol evidence, on which he set aside the paper. The delegates were of opinion that, it being a will both of real and personal estate, it was, reddendo singula singulis, a good disposition of personals, and they rejected parol testimony against it.
Roberts, in his treatise op Wils, ch. 1, part 17, p. 198,* cites a case to this effect: a will had been fully drawn out and approved, and the attorney had directions to make a fair copy, and to bring it the next morning to be executed: but the testatrix died that night. It was held as conclusive of her having made up her mind, and was admitted as a will of personals.
*It seems to me to result from all the cases, when we are deciding on a paper, whether on its face it is testamentary or not, that it is the mind, not the words, the intention, not the manner, which is to be looked to; unless, indeed, the words or manner shew a suspended mind and intention.
The substance of the doctrine as laid down in Coles v. Trecothick, 9 Ves. 249, seems to be, that to begin a will thus: "I, A. B. do make this my will,” if attested by three witnesses, makes it a good will of lands, though there is no signature at the end of it. This publication, and the name thus written, seems, then, to be considered a good signing; but, I believe, that is not held to be enough here, inasmuch as without a signature to an olograph will of lands, there would be no sufficient evidence of a concluded and findal act. But it is there said, “The observation is just, that, as to personal estate, if it appears, upon the will, that something more is intended to be done, and the party was not arrested by sickness or death, that (viz. beginning the will as above) is not held a signing the will; which purports that there is to be a further act.” The paper before us, was signed and sealed when first written: it after-wards, received some alterations when it was dated, and again signed; and, finally, it underwent farther alterations, in which provision was made for the testator’s wife, his executors were changed, and it was again dated and signed. Taking it on its face then, how can we say, that any further act was intended unless the want of *324 form shall be a ground on which we shall infer such intention? And I again ask, if the parol evidence as to intention, had never existed, or had been rejected, and was not in the record, could we infer, from this paper, an intention to write a will more at large, and so reject it? The paper disposes of his whole estate, names his executors, provides for his funeral and tumbstone. There is nothing doubtful about it.
It was said, he intended the land and slaves were to be entailed; and hence it is inferred, that if he had known he could not do this, he might have made other provisions. *This is very true: but, surely, such ignorance is not sufficient to set aside a will otherwise good. The words, “my land to be entailed,” are said to be words of direction toa scrivener; but they were to be entailed, not to him and the heirs of his body, but to him and his heirs forever. Whether he had any definite notions of the distinction between estates tail or in fee, it is hard to determine. These words, perhaps, would carry a fee, even if it had been lawful to create an estate tail. But he may have thought that he was giving the property in tail; and if from the circumstances apparent on the face of this paper, and independent of this clause, we are bound to consider him as writing a testamentary paper, surely, the form of words by which he creates an estate tail, is not, in itself, enough to found a belief, that he was merely writing directions. We often feel ourselves bound to construe a will as giving an estate tail, when we believe no such thing was intended; but we do not therefore say, that if the testator had been well advised, he would not have made such.a will, but would have inserted other provisions, and that therefore such a paper is not “the law and the testament,” and something .further was intended.
If, however, there be a well founded doubt, arising from the face of this writing, whether it was intended as a testamentary paper or not, then, it is said, parol evidence may be admitted against it. How stands the case upon the parol evidence? [Here the judge stated and examined the whole of the parol evidence very fully and minutely.] He concluded: The weight of the evidence, I think, goes clearly to prove, that the testator considered he had a will, by which his estate would pass after his death, and the bulk of it to Alexander Sharp, according to his uniform intentions in his favour, always expressed to those to whom he made known his wishes. He may have wished to draw it, or have it drawn, in better form: but he clearly intended this, paper to be his will if he should die without altering it. If a will is once made, no expression of an intention to have it drawn in some proper form, or even to alter it, if the testator does *not do so, but, on the contrary, says he has a will, which is found carefully put away, clear of all suspicion of fraud or management, can have the effect of setting the will aside. The evidence, in this case, so far from proving an intestacy, I think, supports the paper before us as a will.
In this opinion, GREEN and CARR, J.r concurred, so that the sentence of the circuitcourt was reversed, and the writing in question was ordered to be admitted to probat,, and recorded, as the perfect last will and-testament of the deceased.

London edition of 1809.